Joseph Alan Venti (SBN 031742008)
joeventi@wcblegal.com
WILLIAMS CUKER BEREZOFSKY, LLC
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002-1163
856.667.0500
856.667.5133 (fax)

Michael J. Quirk (*Pro Hac Vice*)
mquirk@wcblegal.com
WILLIAMS CUKER BEREZOFSKY, LLC
1515 Market Street, Suite 1300
Philadelphia, PA 19102
215.557.0099
215.557.0673 (fax)

Marc R. Stanley (*Pro Hac Vice*)
marcstanley@mac.com
Martin Woodward (*Pro Hac Vice*)
mwoodward@stanleylawgroup.com
STANLEY LAW GROUP
6116 N. Central Expwy., Suite 1500
Dallas, TX 75206
214.443.4300
214.443.0358 (fax)

[Additional counsel on signature page]

*Counsel for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THERESA JENNER, individually and on behalf of all others similarly situated, | § § § | |
| PLAINTIFFS, | § § | |
| v. | § § | CASE NO. 2:15-cv-06152 (The Hon. Claire C. Cecchi) |
| VOLVO CARS OF NORTH AMERICA, LLC, | § § § | |
| DEFENDANT. | § § | Motion Date: Dec. 7, 2015 |

### PLAINTIFF'S OPPOSITION TO
### DEFENDANT'S MOTION TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iiii

I. INTRODUCTION .................................................................................. 1

II. SUMMARY OF KEY ALLEGATIONS ...................................................... 2

   A.  Volvo made and sold cars with an "rdar" defect and
      knowingly failed to disclose the defect to consumers ......................... 3

   B.  Jenner bought a defective Volvo and discovered the
      defect only after a mechanic's diagnosis of it as the
      cause of a dead car battery .................................................................. 6

III. ARGUMENT ...................................................................................... 8

   A.   Because there is no conflict of law between New Jersey
      and Rhode Island in connection with any of Jenner's
      claims, New Jersey law applies here ................................................... 8

   B.  The Court should deny Volvo's request to dismiss
      Jenner's implied warranty of merchantability claim
      because it is not time-barred ............................................................... 10

   C.  Jenner adequately alleges Volvo knew about the rdar
      defect and did not disclose it, requiring denial of Volvo's
      request to dismiss her fraud claims ..................................................... 13

     1.   The Court should reject Volvo's assertion that the
        expiration of the warranty period forecloses Jenner's
        fraud claims ................................................................................... 13

     2.   Jenner's allegations of Volvo's knowing omission satisfy
        Rule 9(b) ......................................................................................... 16

   D.  Jenner sufficiently states a claim for breach of the implied
      covenant of good faith and fair dealing .............................................. 19

i

IV. CONCLUSION ..................................................................................... 21

CERTIFICATE OF SERVICE ................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Dewey v. Volkswagen AG,*
        558 F. Supp. 2d 505 (D.N.J. 2008) .............................................11, 19, 20

*Docteroff v. Barra Corp. of Am.,*
        659 A.2d 948 (App. Div. 1995) .............................................................11

*Hamilton v. Prudential Ins. Co. of Am.,*
        18 F. Supp. 3d 571 (D.N.J. 2014) .........................................................17

*Handrigan v. Apex Warwick, Inc.,*
        275 A.2d 262 (R.I. 1971) .......................................................................9

*Henry v. John W. Eshelman & Sons,*
        209 A.2d 46 (R.I. 1965) .........................................................................9

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,*
        1999 WL 33495352 (D.N.J. May 14, 1999) ....................................11, 12

*In re Norvergence,*
        384 B.R. 315 (Bankr. D.N.J. 2008)...........................................17, 18, 19

*In re Prudential Ins. Co. of Am. Sales Prac. Litig.,*
        975 F. Supp. 584 (D.N.J. 1996) ...........................................16, 17, 19, 20

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
        313 U.S. 487 (1941)................................................................................8

*Mickens v. Ford Motor Co.,*
        900 F. Supp. 2d 427 (D.N.J. 2012) ...........................................15, 18, 19

*Nelson v. Nissan N. Am., Inc.,*
        894 F. Supp. 2d 558 (D.N.J. 2012) ....................................................11, 12

*Noble v. Porsche Cars N. Am., Inc.,*
    694 F. Supp. 2d 333 (D.N.J. 2010) ........................................................14

*P.V. v. Camp Jaycee,*
    962 A.2d 453 (N.J. 2008)................................................................8, 10

*Perkins v. DaimlerChrysler Corp.,*
    890 A.2d 997 (App. Div. 2006) ........................................................13, 14

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
    742 F.2d 786 (3d Cir. 1984)..................................................................16

*Simpson v. Widger,*
    709 A.2d 1366  (App. Div. 1998) ...........................................................11

*Spring Motors Distribs. Inc. v. Ford Motor Co.,*
    489 A.2d 660 (N.J. 1985)......................................................................10

*Wilson v. Amerada Hess Corp.,*
    773 A.2d 1121 (N.J. 2001)....................................................................20

**Statutes and Rules**

N.J. Stat. Ann. § 12A:2-725 ......................................................................10

R.I. Gen. Laws Ann. § 6A-2-318 ..............................................................9,10

# I. INTRODUCTION

Theresa Jenner bought a new car from Volvo. She eventually noticed that her car batteries were dying too quickly. Her Volvo dealership determined that the satellite receiver in her car—called an "rdar"—was responsible for prematurely draining the batteries. The Volvo dealership fixed the problem by installing a software upgrade affecting the rdar. But instead of covering the cost of repairing the Volvo defect, it charged Jenner nearly $300, which she paid.

In her Complaint, Jenner alleges that Volvo always knew about the rdar defect and intentionally failed to disclose it, resulting in her purchase of a defective car (and in additional payments to address the defect). On behalf of a proposed class, she claims Volvo violated the New Jersey Consumer Fraud Act ("NJCFA"), breached the implied warranty of merchantability and the implied covenant of good faith and fair dealing, and committed common law fraud by concealment.

In its motion to dismiss Jenner's Complaint, Volvo accuses Jenner of trying to get more than she bargained for. Relying mainly on caselaw involving product components that fail after a fixed warranty period, Volvo claims it had no duty to disclose the defect to Jenner in the first place because she did not discover it until after her warranty expired. (Volvo also

1

raises various technical arguments).

But as Volvo implicitly acknowledges, Jenner's Complaint is based on Volvo's failure to disclose a defect that was present and that it knew about when it sold the car to her. Jenner is clear that she seeks not to unfairly extend her warranty for the life of her car, but only to redress the harm Volvo caused her. Jenner's detailed allegations plausibly support each of her claims, and the Court should deny Volvo's motion.

## II. SUMMARY OF KEY ALLEGATIONS

In evaluating whether Jenner's allegations plausibly support her claims, the Court must accept them as true and view them in the light most favorable to Jenner. But Volvo urges the Court to gloss over the detailed allegations in the Complaint and jump to the conclusion that it has no liability for selling defective cars to Jenner and the public.

As the following summary of the key allegations shows, Jenner's Complaint is not—as Volvo would have it—an attempt to get more from Volvo than she bargained for by extending a warranty for the lifetime of her car. Jenner bases her claims on a detailed description of the defect in Volvo's cars and her experience discovering it, including Volvo's knowledge and concealment of the vital information that a defect in its cars prematurely drains batteries. Any reasonable consumer expects and needs to

2

know this when buying a car.

**A.      Volvo made and sold cars with an "rdar" defect and knowingly failed to disclose the defect to consumers**

Volvo builds cars with the ability to receive a satellite radio signal from third-party satellite radio providers. (Complaint ¶¶ 1, 14.) Since at least 2008, all Volvo cars include this feature—called a "remote digital audio receiver," or "rdar"—which is useful only to car owners who subscribe to a third-party service that broadcasts radio content from a satellite. (*Id.*)

But there is a defect in the software for rdar installed in Volvo cars whereby the device continues to search for a satellite signal even when the car is not running. (*Id.* ¶ 2) A Volvo car equipped with an "rdar" will continue to draw power from the battery *even when the car is not running* regardless of whether the owner is subscribed to a third-party satellite radio service. (*Id.* ¶ 15) In essence, the "rdar" causes the car to search for a satellite radio signal even though its owner has not subscribed to a third-party service. (*Id.*) This drains the car's battery when the car is not running. (*Id.* ¶ 2)

The drain on the battery caused by the "rdar" when the car is not running is a defect. (*Id.* ¶ 16) This defect has drained the batteries of Volvo car owners throughout the United States, and caused them to encounter the same problems as Jenner. (*Id.*)

Volvo knows all about this defect, which is easily fixed with a "software upgrade" to the rdar. (*Id.* ¶ 3) Volvo does not disclose this defect to its customers, however. (*Id.*) And Volvo effectively holds its customers hostage by refusing to install the "software upgrade" without a charge of hundreds of dollars to repair a defective device that is unnecessary for the car's safe operation and is, in many cases, simply unwanted. (*Id.*)

Volvo car owners have documented their problems in several online forums. (*Id.* ¶ 18) One such owner described the experience as follows:

> had same problem with my 2010. After 3 days of not driving, battery dead. happened once, dealer said nothing's wrong with it and I thought we left something on. Second time, took it to dealer and they changed the battery. 3rd time, new battery was dead and they did a RDAR software upgrade and said it was causing a drain because it would stay "online". I wish they would I have told me that the first time, so it wouldn't have been so agonizing dealing with a dead car, tow truck...etc...[1]

(*Id.*) Another owner described the experience like this:

> I have just bought this C30 2009 left car for one week and battery was totally drained. It would not hold charge and I took to dealer.
> I have just replaced windshield due to stone damage.
> The warranty is expiring in 1 month.

---

[1] http://forums.swedespeed.com/showthread.php?183619-Battery-Drain-Problem (comment of "myxc60" dated 12-05-13, 8:20am) (last visited June 23, 2015).

[2] http://www.matthewsvolvosite.com/forums/viewtopic.php?t=64097 (comment of "TonyV" dated 22 Jun 2014, 22:16) (last visited June 23, 2015). Other examples of comment forums containing similar descriptions of the same defect include http://volvoforums.com/forum/volvo-c70-14/2011-c70-battery-drain-62586/page3/ (last visited June 23, 2015) and

> Dealer reloaded firmware saying that there was drain from RDAR and it is firmware error.
> Seems a bit hard to believe that this issue is just fixed now in 5 year old vehicle. I found from internet search that RDAR is related to satellite radio which I am not using.
> Has anyone heard of this error?
> How can I find the equipment and info to read and identify the firmware codes?
> Wanting to love my used C30 but struggling…[2]

(*Id.*)

Thus, Volvo has been and is aware of the defect in its vehicles related to "rdar." (*Id.* ¶ 19) But Volvo did not and does not disclose the defect to purchasers at the time of purchase, nor did Volvo conduct a recall of its vehicles or otherwise make Volvo owners aware of the defect through any kind of publicity or notification. (*Id.*)

Instead, Volvo waits for car owners to discover the defect on their own, usually through an instance where the car would not start because of a drained battery. (*Id.* ¶ 20) And when car owners are forced to bring their vehicles in for needed repair in order to drive them again, Volvo charges them for the repair—a "software upgrade" to the defective device—instead

---

[2] http://www.matthewsvolvosite.com/forums/viewtopic.php?t=64097 (comment of "TonyV" dated 22 Jun 2014, 22:16) (last visited June 23, 2015). Other examples of comment forums containing similar descriptions of the same defect include http://volvoforums.com/forum/volvo-c70-14/2011-c70-battery-drain-62586/page3/ (last visited June 23, 2015) and http://repairpal.com/why-does-my-c30-battery-drain-for-no-apparent-reason-311 (last visited June 23, 2015).

of providing it for free. (*Id.*)

**B.   Jenner bought a defective Volvo and discovered the defect only after a mechanic's diagnosis of it as the cause of a dead car battery**

Theresa Jenner bought a new Volvo S40 on April 29, 2009 from Tasca Volvo, an authorized Volvo Dealer in Cranston, Rhode Island. (*Id.* ¶ 10) When she bought the car, Jenner also purchased an extended warranty covering mechanical repairs to the car for a period of 72 months or until the car was driven for 75,000 miles. (*Id.* ¶ 11)

On September 15, 2014, Jenner's car would not start because its battery was dead. (*Id.* ¶ 12) Jenner had the car towed to Tasca Volvo, where the battery was replaced. (*Id.*) By this time, Jenner had driven the car for more than 75,000 miles, and the extended warranty coverage was no longer in effect. (*Id.*) Jenner received an invoice describing the work done on her car, but no mention is made of the car's defective battery-draining feature that enables it to receive a satellite radio signal. (*Id.* & Exh. A). Tasca Volvo charged Jenner $248.91 for this work, and she paid this amount (plus sales tax). (*Id.*)

Only four and a half months later, on January 28, 2015, Jenner parked her car in a garage, where it stayed for about 48 hours to wait out a blizzard, which was unofficially named Winter Storm Juno. (*Id.* ¶ 13) Jenner could

not start the car when she returned to it because the battery had once again drained. (*Id.*) She and her husband subscribed to AAA Roadside Assistance, which dispatched a technician to examine the vehicle's electrical system and test the battery. (*Id.*) That testing revealed that there was a drain on the car electrical system when it was shut off. (*Id.*) The car was jumpstarted, driven to Tasca Volvo, and Tasca Volvo was made aware of the roadside assistance technician's findings. (*Id.*) Tasca Volvo made repairs and issued another invoice to Jenner, which states:

> ,,,,80518 battery, charging system test o.k. found .06a draw, fault
> ,,,,traced and found rdar to be off line, recover rdar and download
> ,,,,software upgrade.

(*Id.* & Exh. B) Tasca Volvo charged Jenner $299.77 for this work, and she paid this amount (plus sales tax). (*Id.*)

Jenner also discovered that the defect cannot be mitigated by having the "rdar" turned off. (*Id.* ¶ 17) When Tasca Volvo told Jenner about the issue with the rdar, she asked to remove or disable the device. (*Id.*) She was told by Tasca Volvo that the "rdar" was integrated into the car's electrical system and could not be removed. (*Id.*) Thus, the only way for her to eliminate the risk of future battery failure was to pay hundreds of dollars for a "software upgrade" to repair a device she did not use. (*Id.*)

## III. ARGUMENT

### A. Because there is no conflict of law between New Jersey and Rhode Island in connection with any of Jenner's claims, New Jersey law applies here

Volvo notes correctly that New Jersey's choice of law rules apply because Jenner filed this case in Volvo's home state of New Jersey. (Motion at 6)(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Volvo also accurately states that the first prong of the test to determine whether a conflict exists is to examine the applicable laws, and "[i]f no conflict exists on an issue, the inquiry ends there, and the Court applies the law of the forum state." (Motion at 6)(quoting *P.V. v. Camp Jaycee*, 962 A.2d 453, 455 (N.J. 2008)). As Volvo puts it, "New Jersey law applies unless there is a showing that there is an outcome-determinative difference between the laws of different states on an issue." (Motion at 16)(citing *Camp Jaycee*, 962 A.2d at 455).

Volvo makes no such showing anywhere in its motion. It argues the very opposite in connection with Jenner's NJCFA claim, admitting that "there is no conflict with Rhode Island law" on the grounds on which it moves to dismiss that claim. (Motion at 10, 16). In arguing for dismissal of Jenner's claims for common law fraud and breach of the implied covenant of good faith and fair dealing, Volvo emphasizes the similarities of Rhode

Island law to New Jersey law in the very few instances it even bothers to cite

Rhode Island law, so Volvo necessarily never shows an outcome-

determinative difference between the laws of those states on these issues.

(Motion at 22-24, 24-26).

The only outcome-determinative difference Volvo identifies anywhere

in its motion is a privity requirement for an implied warranty of

merchantability that Volvo claims exists today in Rhode Island as described

in caselaw from the 1950s and 1960s. (Motion at 20)(citing, *inter alia*,

*Henry v. John W. Eshelman & Sons*, 209 A.2d 46, 49-50 (R.I. 1965)).

However, Rhode Island abolished the privity requirement by amending its

Uniform Commercial Code in 1969 to read: "A seller's or a manufacturer's

or a packer's warranty, whether express or implied, including but not limited

to a warranty of merchantability provided for in § 6A-2-314, extends to any

person who may reasonably be expected to use, consume, or be affected by

the goods and who is injured by breach of the warranty." R.I. Gen. Laws

Ann. § 6A-2-318; *see also Handrigan v. Apex Warwick, Inc.*, 275 A.2d 262,

266 & n.4 (R.I. 1971)("The purpose of this section is to give the buyer's

family, household and guests the benefit of the same warranty which the

buyer received in the contract of sale, thereby freeing any such beneficiaries

from any technical rules as to 'privity.'")(discussing amendment and quoting

Comment 2 to R.I. Gen. Laws Ann. § 6A-2-318).

As Volvo acknowledges, New Jersey has likewise abolished the privity requirement for an implied warranty of merchantability claim. (Motion at 20)(citing *Spring Motors Distribs. Inc. v. Ford Motor Co.*, 489 A.2d 660, 676-77 (N.J. 1985)). As with Jenner's other claims, there is thus no outcome-determinative difference between New Jersey law and Rhode Island law in connection with her claim for breach of the implied warranty of merchantability. The Court should therefore find no conflict exists, and it should apply the law of New Jersey to all claims in this case. *Camp Jaycee*, 962 A.2d at 455.

**B.    The Court should deny Volvo's request to dismiss Jenner's implied warranty of merchantability claim because it is not time-barred**

Other than its insupportable and incorrect claim that Jenner's implied warranty of merchantability claim should be dismissed for lack of privity, the only other argument Volvo makes is its assertion that the claim is time-barred under the four-year statute of limitations in N.J. Stat. Ann. § 12A:2-725. (Motion at 21-22). Volvo is again incorrect.

New Jersey courts have held "that where, incident to a sale, the seller of consumer goods warrants to repair and maintain the goods for a period of time in the future, the provisions of N.J.S.A. § 12A:2-725(2) control, and the

four-year statute of limitations does not begin to run until after the breach of warranty was or should have been discovered." *Docteroff v. Barra Corp. of Am.*, 659 A.2d 948, 955 (App. Div. 1995). Here, as Jenner pleads (and as Volvo freely admits), Volvo warranted her car for 75,000 miles. (Compl. ¶ 11; Motion at 3). But Jenner did not and could not have discovered Volvo's breach—the rdar defect—until after the warranty expired. (Compl. ¶¶ 13, 34, 38). The statute of limitations thus did not begin to run until January 28, 2015 at the earliest, and Jenner filed her Complaint promptly and timely on August 12, 2015. *Docteroff*, 659 A.2d at 955.

Other courts have held that the presence of fraud may toll the running of the statute of limitations for warranty claims. *Nelson v. Nissan N. Am., Inc.*, 894 F. Supp. 2d 558, 567 & n.6 (D.N.J. 2012)(citing *Simpson v. Widger*, 709 A.2d 1366  (App. Div. 1998)); *see also Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).  As another court explained, a plaintiff establishes fraudulent concealment for purposes of tolling by alleging (1) wrongful concealment by the defendant, resulting in (2) her failure to discover the operative facts for the basis of her claim within the limitations period (3) despite due diligence. *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 1999 WL 33495352, *11 (D.N.J. May 14, 1999), *vacated in part on other grounds*, 1999 WL 34824273 (D.N.J. July 27, 1999).

11

In *Ford Motor Co.*, the court found the plaintiffs' allegations that Ford knew of a defect in ignition switches it began installing in vehicles in 1984, and Ford's acknowledgment of the defect by replacing switches for some customers in 1988 and 1989 due to switch-related fires, sufficient to establish the first element of fraudulent concealment. 1999 WL 33495352, *11. The court also found the second and third elements satisfied by the plaintiffs' allegations that they did not and could not have discovered their claims against Ford until a federal agency initiated an investigation into the switch-related fires in 1992. *Id.* Jenner's allegations mirror those of the plaintiffs in *Ford Motor Co.*, and this Court should likewise find that all three elements are satisfied. (*See, e.g.*, Compl. ¶¶ 1,3, 12-19).

For purposes of Volvo's motion under Rule 12(b)(6), the court should draw all reasonable inferences in Jenner's favor and determine that a reasonable jury could find based on Jenner's allegations that Ford concealed the defect such that she could not reasonably have discovered it until she did. Accordingly, the Court should decline to dismiss Jenner's implied warranty of merchantability claim on the basis of limitations. *Ford Motor Co.*, 1999 WL 33495352, *11; *Nelson*, 894 F. Supp. 2d at 567 & n.6.

**C.     Jenner adequately alleges Volvo knew about the rdar defect and did not disclose it, requiring denial of Volvo's request to dismiss her fraud claims**

1.     The Court should reject Volvo's assertion that the expiration of the warranty period forecloses Jenner's fraud claims

The centerpiece of Volvo's motion is its argument that it had "no duty to disclose potential problems that might occur in a vehicle after the warranty expires." (Motion at 2). Volvo repeats this argument in requesting dismissal of Jenner's NJCFA claim (Motion at 11-13), her claim for common law fraud by concealment (Motion at 22-23), and her claim for breach of the implied covenant of good faith and fair dealing (Motion at 25 n.13). Volvo dubs the argument "the *Perkins* rule" (Motion at 13) after the case of *Perkins v. DaimlerChrysler Corp.*, 890 A.2d 997 (App. Div. 2006)(cited and quoted in Motion at 11-12 and *passim*).

*Perkins* is distinguishable on its facts from Jenner's claims, and thus does not help Volvo at all, notwithstanding the considerable emphasis Volvo gives it. As Volvo explains (Motion at 12-13), *Perkins* involved a vehicle's exhaust manifold that eventually failed after the end of a warranty period. The court declined to interpret the NJCFA "to cover claims that the component part of a product, which has lasted through the warranty period, may eventually fail," as that would unfairly extend the warranty. *Perkins*,

13

890 A.2d at 1005. Volvo cites other cases with analogous facts that followed *Perkins* and reached similar holdings. *See, e.g., Noble v. Porsche Cars N. Am., Inc*., 694 F. Supp. 2d 333 (D.N.J. 2010)(cited in Motion at 12 and *passim*).

But Jenner does not plead (like the plaintiffs in *Perkins* and its progeny) that she got the benefit of her rdar, which lasted through her extended warranty period and only then failed. She alleges that the rdar was defective from the outset, and, as such, it was prematurely draining her batteries the entire time she owned her car (and, because Volvo intentionally did not disclose it, she could not have and did not discover it until after the warranty period expired). (*See, e.g*., Compl. ¶¶ 1, 3, 12-19) As Jenner alleges, on learning of the defect, she asked for the rdar to simply be disabled or removed from the car, only to be told this is not possible due to its integration into the car's electrical system. (Compl. ¶ 17) Thus, this case does not present a "*Perkins* rule" situation where a plaintiff is effectively trying to extend a warranty to cover the subsequent failure of an essential component that functioned properly for a significant time; rather, Jenner pleads facts that give rise to a claim squarely within the NJCFA based on Volvo's knowing concealment of the omnipresent rdar defect. (Compl. ¶¶ 30-37) The "*Perkins* rule" likewise does not bar Jenner's fraud claim

14

(Compl. ¶¶ 48-52) or her claim for breach of the implied covenant of good faith and fair dealing (Compl. ¶¶ 53-57), which are based on the same conduct of Volvo.

*Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427 (D.N.J. 2012), is instructive. In denying a car manufacturer's motion to dismiss an NJCFA claim based on the plaintiff's allegations of concealment of a defect causing galvanic corrosion, the district court held that "Warranty coverage of a particular problem does not, as a matter of law, negate a CFA claim that the manufacturer knowingly omitted information about a design defect." *Mickens*, 900 F. Supp. 2d at 442; *see also id.* at 442-43. As applied here, *Mickens* illustrates that, contrary to Volvo's suggestion, the warranty term does not operate to cut off claims of knowing concealment. *Mickens* also addressed and distinguished *Perkins* and its progeny, noting that (as with Jenner's allegations that the rdar in her car had a defect from the outset notwithstanding her later discovery of it) the plaintiff sufficiently alleged facts about Ford's knowledge of the defect and its presence in his car before the warranty period expired. *Id.* at 443-44.

The Court should therefore find the "*Perkins* rule" inapplicable. Volvo's invocation of *Perkins*—and its averment that it had "no duty to disclose potential problems that might occur in a vehicle after the warranty

expires"—implicitly acknowledges that it has a duty to disclose defects exactly like the rdar defect in Jenner's car that already exists in cars it has sold to consumers who couldn't possibly know about them.

> 2.  Jenner's allegations of Volvo's knowing omission satisfy Rule 9(b)

Volvo also challenges Jenner's NJCFA claim and her common law fraud claim by criticizing her allegations of Volvo's knowledge of the defect as too conclusory and, thus, insufficient. (Motion at 13-16, 23-24). Volvo claims that Jenner does not meet the heightened pleading standard required for such claims by Rule 9(b). (Motion at 2, 23)

The Court should summarily reject Volvo's argument that Jenner's allegations are insufficient. *In re Prudential Ins. Co. of Am. Sales Prac. Litig.*, 975 F. Supp. 584 (D.N.J. 1996) discussed the Rule 9(b) pleading requirements at length, emphasizing that the rule's purpose is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *In re Prudential*, 975 F. Supp. at 595 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). After analyzing them, the *In re Prudential* court proceeded to find the plaintiffs "have provided sufficient factual allegations to place Prudential on notice of their claims and to enable the company to prepare responsive

pleadings." *In re Prudential*, 975 F. Supp. at 595-96 (discussing other examples and concluding "Rule 9(b) is to be applied flexibly."). *Id*. at 596.

Indeed, New Jersey courts routinely find allegations that a defendant "omitted or withheld information from the Plaintiffs" that it knew it should have disclosed sufficient to satisfy Rule 9(b) even absent more detailed allegations. *See Hamilton v. Prudential Ins. Co. of Am.*, 18 F. Supp. 3d 571, 582 (D.N.J. 2014)(denying motion to dismiss fraud by omission claim based only on allegations of knowing failure to disclose material information); *In re Prudential*, 975 F. Supp. at 596 (finding fraud allegations sufficient even though Plaintiffs "have not specifically identified Prudential managers or high level executives who approved of or participated in the alleged scheme….").

*In re Norvergence*, 384 B.R. 315 (Bankr. D.N.J. 2008), provides an instructive example of allegations held sufficient to allege knowledge in the NJCFA context. The defendant, Qwest, challenged the plaintiff's allegations that Qwest knowingly omitted to disclose material facts. *Id.* at 368. The court denied Qwest's motion to dismiss the NJCFA claim, reasoning:

> Plaintiff alleges that Qwest had knowledge of the true value of the Matrix boxes and that the presence of the Qwest logo on NorVergence's brochure induced Plaintiff to sign the equipment leases thereby establishing causation. …. At this stage in the proceeding it is not clear exactly what Qwest knew concerning the alleged NorVergence fraud which involved the

> Qwest name and logo and whether Qwest tacitly approved or
> actively engaged in the allegedly fraudulent scheme. The Court
> is satisfied though that Count I as pled with regard to Qwest
> does present a claim that is plausible on its face. Based on the
> record before the Court and taking all reasonable inferences in
> favor of the Plaintiff, as the non-moving party, the Court denies
> Qwest's motion to dismiss with respect to Count I.

*Id.*; *see also Mickens*, 900 F. Supp. 2d at 444-45 ("Mickens has also

plausibly pleaded facts suggesting Ford's knowledge. … Mickens explains

that Ford had to know that galvanic corrosion would occur based upon

commonly known scientific principles….").

Drawing all reasonable inferences in favor of Jenner, the Court should

similarly find she has sufficiently alleged Volvo knowingly did not disclose

the rdar defect. Her Complaint makes clear that Volvo knew of the specific

defect that harmed her and failed to disclose it to her. This is, indeed, the

only reasonable inference to draw from the fact that when an AAA

technician diagnosed a battery drain and Jenner shared these findings with

Tasca Volvo, Volvo already had a software upgrade at the ready to address

the issue. (Compl. ¶ 13) Moreover, as Jenner alleges, she is not unique in

experiencing the rdar defect with her Volvo car, as is evident from numerous

other complaints posted online.[3] (Compl. ¶ 18) And, taken together, Jenner's

---

[3] While Volvo dismisses these as "hearsay," it nonetheless accepts them as
true for its own purposes by arguing that they were posted only after Jenner
purchased her car, such that they are purportedly insufficient to show

allegations that Volvo had prepared a software upgrade to address a defect it necessarily knew about and demonstrably never told her about are more than adequate to substantiate her fraud claims against Volvo under the Rule 9(b) standard. *In re Prudential*, 975 F. Supp. at 595-96; *In re Norvergence*, 384 B.R. at 368; *Mickens*, 900 F.Supp. 2d at 444-45; (Compl. ¶¶ 1, 3, 12-19, 30-37, 38-47). The Court should deny Volvo's motion to dismiss Jenner's fraud claims accordingly.

### D.  Jenner sufficiently states a claim for breach of the implied covenant of good faith and fair dealing

Volvo requests dismissal of Jenner's claim for breach of the implied covenant of good faith and fair dealing by arguing that Jenner does not identify a particular contractual term Volvo breached (Motion at 24).

In *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 531 (D.N.J. 2008), the court noted that there need not be an express term imposing the obligation of good faith and fair dealing on a defendant. *Id.* "[A]lthough the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent

---

Volvo's knowledge of the defect when it sold the car to Jenner. (Motion at 15) The Court should avoid this hair-splitting exercise and consider the allegations in Jenner's Complaint as a whole, of which the online consumer complaints are only one indicium of Volvo's knowledge, and they strongly support the inference that Volvo always knew about the defect.

express term." *Id.* (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001)). Crucially, the *Dewey* court noted that the very purpose of the implied covenant is to prevent a party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dewey*, 558 F. Supp. 2d at 531 (quoting *Wilson*, 773 A.2d at 1126). Having denied the defendants' motion to dismiss on grounds that the plaintiffs' warranty claims were outside the limitations period, the court similarly denied the motion as to the implied covenant claim. *Dewey*, 558 F. Supp. 2d at 531. This case presents similar facts, and the Court should likewise reject Volvo's argument.

Volvo additionally requests dismissal of Jenner's implied covenant claim because her "omission allegations are based on non-disclosure before she purchased the vehicle, and the duty of good faith and fair dealing does not apply to contract formation." (Motion at 24-25) In fact, Jenner alleges that Volvo breached the implied covenant by failing to notify her of the defect related to "rdar," and failing to fully and properly repair this defect. (Compl. ¶ 56) The court in *In re Prudential Ins. Co. of Am. Sales Prac. Litig.*, 975 F. Supp. 584, 615 (D.N.J. 1996) found similar allegations sufficient to state an implied covenant claim, and this Court should reach the same result. Volvo's conduct resulted in Jenner receiving and driving a

defective car and incurring out-of-pocket costs as a result of the rdar defect, thereby giving Jenner less than what she bargained for.

## IV. CONCLUSION

At the pleading stage, the Court should decline to determine that Volvo is a mere innocent bystander to an unforeseen situation involving a defect in its product. Every reasonable inference to be drawn from Jenner's thorough allegations shows that Volvo—which was silent as Jenner and others continued to drive defective cars, and which charged extra money to repair the defect to a feature Jenner never wanted nor used only after Jenner brought it to Volvo's attention—knowingly concealed the rdar defect, to Jenner's economic detriment. The Court should deny Volvo's motion in its entirety.

DATED this 23rd day of November, 2015.


Respectfully submitted,


_____/s/_____
Joseph Alan Venti (SBN 031742008)
joeventi@wcblegal.com
WILLIAMS CUKER BEREZOFSKY, LLC
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002-1163
856.667.0500
856.667.5133 (fax)

Michael J. Quirk
mquirk@wcblegal.com
*Pro Hac Vice*
WILLIAMS CUKER BEREZOFSKY, LLC
1515 Market Street, Suite 1300
Philadelphia, PA 19102
215.557.0099
215.557.0673 (fax)

Marc R. Stanley
marcstanley@mac.com
*Pro Hac Vice*
Martin Woodward
mwoodward@stanleylawgroup.com
*Pro Hac Vice*
STANLEY LAW GROUP
6116 N. Central Expwy., Suite 1500
Dallas, TX  75206
214.443.4300
214.443.0358 (fax)

Andrew S. Kierstead
ajkier@aol.com
*Pro Hac Vice Forthcoming*
LAW OFFICE OF ANDREW KIERSTEAD
1001 SW 5th Avenue, Suite 1100
Portland, OR 97204
Tel. (508) 224-6246
Fax (508) 224-4356

Peter N. Wasylyk
pnwlaw@aol.com
*Pro Hac Vice Forthcoming*
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908
Tel. (401) 831-7730
Fax (401) 861-6064

*Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 23, 2015, I electronically filed the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Mark S. Kundla
Mkundla@HKMPP.com

Paul Daly
Pdaly@HKMPP.com

_____/s/_____
Joseph Alan Venti